IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HEZEKIAH HAMILTON, | ) </br> ) </br> ) |
| *Petitioner*, | ) </br> ) |
| v. | )    No. 15 C 7592 </br> ) |
| ANTHONY WILLS, Warden, Menard Correctional Center, | )    Judge Virginia M. Kendall </br> ) </br> ) </br> ) |
| *Respondent*. | ) |

**MEMORANDUM OPINION AND ORDER**

Hezekiah Hamilton petitions this Court for a writ of habeas corpus claiming ineffective assistance of counsel in violation of the Sixth Amendment and an excessive sentence violating due process under the Fourteenth Amendment. (Dkt. 1). For the following reasons, the Court denies the petition.

**BACKGROUND**

On October 30, 2007, Hamilton, a Jamaican citizen, stabbed Brenetta Beck to death. (Dkt. 84-1); *People v. Hamilton*, 962 N.E.2d 1105, 1106 (Ill. App. Ct. 2011). After a bench trial, the Circuit Court of Kane County found Hamilton guilty of first-degree murder and sentenced him to 55 years in prison. *Hamilton*, 962 N.E.2d at 1106.

**A.    Trial**

At trial, the State introduced evidence that Hamilton had lived with Beck for several years until 2006. (Dkt. 84-3); *People v. Hamilton*, 2014 WL 7274874, at *2 (Ill. App. Ct. Dec. 19, 2014). Hamilton is the father of Beck's older daughter. *Hamilton*, 2014 WL 7274874, at *2. During child-support proceedings concerning the daughter, a witness testified that Hamilton appeared "very

1

angry" and "demanded to know who had brought the case." *Id.* at *6. According to Beck's family and Hamilton's fiancée Candice Sweat, Hamilton is also the father of Beck's younger son. *Id.* at *2. During cross examination of Beck's mother, Hamilton's trial counsel asked her how she knew Hamilton is the father. *Id.* She testified, "Because my daughter said it was his child, and she didn't have sex with anyone else." *Id.* Beck also told her mother that Hamilton "had raped her and that's how she ended up pregnant." *Id.* Hamilton's counsel started to object but abandoned the effort. *Id.* "Never mind," he said. *Id.*

Beck's aunt testified that she pounded on the door of Beck's apartment around 6:00 a.m. on October 30, 2007. *Id.* at *1. She heard Beck's daughter crying inside. *Id.* Then, Beck's aunt heard someone get in a car and speed away. *Id.* She called Beck's mother, who called 911 before driving to Beck's apartment. *Id.* at *1–2. Firefighters broke through the door. *Id.* at *2. Beck's dead body was in the bathroom and there was blood "everywhere." *Id.* Beck had suffered 54 stab wounds to the head, neck, and chest. *Id.* at *1. Apart from Beck's front door, which firefighters had broken down, there were no signs of forced entry. *Id.* at *5. A footprint in the apartment matched the pattern on Hamilton's work boots. *Id.* Police also found a button in the hallway, which was consistent with those on Hamilton's work shirts (but also consistent with buttons on police uniforms). *Id.* According to a DNA expert, blood stains in Hamilton's truck and on his boot and sock came from Beck, as did blood behind the bathroom door and on a CD case in Hamilton's apartment—at least "to a high degree of certainty." *Id.* at *6.

Sweat testified that at the time of the murder, she lived with Hamilton. *Id.* at *2. On October 30, 2007, Sweat and Hamilton woke around 5:00 a.m., and Hamilton left the apartment 10 minutes later, wearing his usual black hooded sweatshirt, a short-sleeved work shirt, work pants, and work boots. *Id.* at *3. Embroidered on Hamilton's company-issued work shirt were his name and his

2

employer's name. *Id.* Sweat left about 10 minutes after Hamilton. *Id.* She called Hamilton during her work commute and they discussed dinner plans. *Id.* Beginning at 5:45 am, Sweat called Hamilton several more times, but he did not pick up. *Id.* Sweat's later calls went straight to voicemail. *Id.* A few minutes before 6:00 a.m., Hamilton called Sweat back and explained that he had been fixing his truck on the side of the road. *Id.* Then, Hamilton told Sweat he needed to hang up and head into work. *Id.*

Suspecting Hamilton had lied to her, Sweat drove to Hamilton's workplace, arriving around 6:20 a.m. *Id.* She did not see his truck in the parking lot. *Id.* Between 6:20 and 6:30 a.m., Sweat called Hamilton again, who said he felt unwell and was driving home. *Id.* Sweat told Hamilton she would go home too. *Id.* Around 7:15 a.m., however, Hamilton called Sweat to say that he was returning to work. *Id.* Sweat said she would meet him there. *Id.* Sweat arrived at Hamilton's workplace before him, and she saw him arrive in his truck around 8:00 a.m. *Id.* Hamilton exited his truck wearing a cream-colored shirt instead of his black sweatshirt. *Id.* Hamilton and Sweat conversed briefly before he went into work. *Id.* Curious about Hamilton's outfit change, Sweat peered into Hamilton's truck. *Id.* She did not see the black sweatshirt in the truck. *Id.* Hamilton's employer's records showed that one of Hamilton's company-issued short-sleeve work shirts went missing. *Id.* at *6.

Contradicting Sweat, Hamilton told police that he had overslept until around 7:00 a.m. that morning and arrived to work late, around 8:00 a.m. *Id.* at *4. He described his route to work, which did not pass near Beck's apartment. *Id.* Asked about his relationship with Beck, Hamilton described her as unreasonable with respect to child support and visitation. *Id.*

Records for Sweat's and Hamilton's cell phones aligned with Sweat's testimony about her calls with Hamilton. *Id.* at *4. The phone records—showing locations of cell towers that connected

3

Hamilton's calls[1]—refuted Hamilton's initial alibi and were "broadly consistent with the State's theory" that Hamilton had murdered Beck. *Id.* At 5:52 a.m., Hamilton's cell phone pinged off a tower within one mile of Beck's apartment. *Id.* at *4–5. Then, Hamilton's phone moved "rapidly" toward his apartment. *Id.* at *4.

The day after the murder, Hamilton repeated his alibi to police: he had overslept and arrived late to work—without driving past Beck's apartment. *Id.* at *5. After officers confronted Hamilton with phone records showing calls with Sweat starting at 5:30 a.m., Hamilton insisted that he had answered those calls without "paying attention." *Id.* But Hamilton backtracked after he learned that the phone records placed him near Beck's apartment. *Id.* His memory was unclear, he explained, and he might have gone to a coworker's home near Beck's apartment to find the cap for his truck bed. *Id.* at *3, 5. Suddenly, Hamilton remembered that he had left his apartment around 5:00 a.m. *Id.* at *5.

Hamilton's bench trial ended in a finding of guilt as to one count of first-degree murder. *Hamilton*, 962 N.E.2d at 1106. The judge sentenced Hamilton to 55 years in prison, five years below the standard-term maximum. *Id.*

**B.    Direct Appeal**

On his first direct appeal, Hamilton argued that his sentence was excessive due to his inevitable deportation to Jamaica. *Id.*[2] He did not argue ineffective assistance of counsel. The appellate court rejected his argument and affirmed. *Id.* at 1107. The Illinois Supreme Court denied Hamilton's *pro se* direct petition for leave to appeal (PLA), in which he challenged his sentence as excessive, invoking the Illinois Constitution and state statutes. (Dkt. 84-2); *People v. Hamilton*,

---

[1] The parties stipulated that cell phones can connect to towers up to five miles away. *Id.*
[2] Wills did not provide copies of the briefs filed in Hamilton's direct and postconviction appeals to the Illinois Appellate Court. (Dkt. 83 at 5 n.3). The appellate court analyzed Hamilton's excessive-sentence claim according to Illinois statutory law. *Hamilton*, 962 N.E.2d at 1106–07.

968 N.E.2d 1069 (Ill. 2012). On April 22, 2023, the United States Supreme Court denied certiorari. *Hamilton v. Illinois*, 569 U.S. 951 (2013).

**C.     Postconviction Petitions**

In 2013, Hamilton filed a *pro se* petition for postconviction relief, this time claiming: (1) his trial counsel was ineffective in eliciting Beck's mother's testimony that he had raped Beck; and (2) his appellate counsel was ineffective for failing to raise the same issue on appeal. (Dkt. 84-4); *see also Hamilton*, 2014 WL 7274874, at *7. The trial court dismissed the petition, and Hamilton appealed on the same issues. *Hamilton*, 2014 WL 7274874, at *7. The appellate court affirmed, holding that Hamilton failed to establish prejudice—a requirement under the two-prong test for ineffective-assistance claims set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.* at *7–8. The evidence against Hamilton was "so overwhelming," it "negated any possibility of prejudice," the appellate court determined. *Id.* at *8. Specifically, "the child-support evidence established [Hamilton's] motive, the cell-phone evidence, as well as witness testimony, defeated [his] alibi, and the DNA evidence established his presence at the scene." *Id.* On March 25, 2015, the Illinois Supreme Court denied Hamilton's postconviction PLA. (Dkt. 84-5); *People v. Hamilton*, 31 N.E.3d 770 (Ill. 2015).

**D.     Habeas Petition**

On August 27, 2015, Hamilton filed this *pro se* petition to vacate his sentence under 28 U.S.C. § 2254, claiming ineffective assistance of trial and appellate counsel and a violation of due process. (Dkt. 1). On September 22, 2015, the Court granted Hamilton's motion to stay the proceedings while he pursued DNA testing and successive postconviction relief in state court. (Dkt. 7).[3] The Court admonished Hamilton to file an amended habeas petition "raising all claims

---

[3] Hamilton's motions for leave to file successive postconviction petitions and motions for DNA testing raise claims unrelated to his current habeas petition. (*See* Dkt. 84-6).

as soon as possible" because additional claims that do not relate back to the original petition could be untimely. (Dkt. 7 at 2). On February 6, 2017, this case was reassigned from the Honorable James B. Zagel. (Dkt. 14). Over three years later, on September 9, 2020, the Court granted Hamilton's motion to reinstate the case when his DNA testing and successive postconviction relief were finally completed. (Dkt. 60).[4]

Respondent Anthony Wills[5] responded to Hamilton's petition on November 7, 2022. (Dkt. 83). Two days later, on November 9, 2022, Hamilton filed a motion for leave to amend his habeas petition by "correct[ing] omissions in his petition and other oversites [sic] and mistakes." (Dkt. 85 at 2).[6] He has not further described those omissions and mistakes. Nor has Hamilton filed a proposed amended petition to date.

## STANDARD OF REVIEW

Title 28 U.S.C. § 2254 governs federal habeas corpus petitions by state prisoners. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) limits a federal court's ability to overturn state-court judgments under § 2254. Under § 2254(d), a federal habeas court can grant relief only if the state court's decision "was contrary to, or involved an unreasonable application of . . . 'clearly established'" Supreme Court precedent. *Shoop v. Hill*, 139 S. Ct. 504, 506 (2019) (per curiam). To prevail on a habeas petition, a state prisoner must show that the state-court decision was "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Burt v. Titlow*, 571 U.S. 12, 19–20 (2013) (quoting *Harrington v.*

---

[4] Hamilton filed his motion to reinstate with the assistance of appointed counsel. (Dkt. 58). Hamilton later asked his counsel to withdraw, (Dkt. 76), and he has continued pursuing habeas relief *pro se*. (Dkts. 77, 80, 85, 86).
[5] Hamilton's petition named Kimberley Butler. (Dkt. 1). Since Anthony Wills is now the warden at Menard, he is substituted as the proper respondent. *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) ("[T]he proper respondent to a habeas petition is "the person who has custody over [the petitioner]." (quoting 28 U.S.C. § 2242)); Fed. R. Civ. P. 25(d) (providing that a public "officer's successor is automatically substituted as a party").
[6] Hamilton dated his motion October 8, 2022, but it was not scanned and filed until November 9. (Dkt. 85).

*Richter*, 562 U.S. 86, 103 (2011)). This strongly deferential standard "erects a formidable barrier" for state prisoners seeking federal habeas relief. *Id*. at 19.

As to his ineffective-assistance claims, Hamilton bears the burden of showing that his counsel's representation fell below an objective standard of reasonableness (performance prong), which prejudiced his defense (prejudice prong). *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). In assessing the performance prong, the Court asks "whether, in light of all the circumstances, [counsel's] identified acts or omissions were outside the wide range of professionally competent assistance." *Harper v. Brown*, 865 F.3d 857, 860 (7th Cir. 2017) (quoting *Strickland*, 466 U.S. at 690). Then, the prejudice prong requires determining whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 860–61 (quoting *Strickland*, 466 U.S. at 694). "Judicial scrutiny of counsel's performance must be highly deferential," and there is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689–90.

Thus, when a state prisoner triggers both AEDPA and *Strickland* in a federal habeas petition, he faces double deference. *Meyers v. Gomez*, 50 F.4th 528, 644 (7th Cir. 2022) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

## **DISCUSSION**

Hamilton claims: (1) his trial counsel was ineffective for eliciting testimony that he raped Beck; (2) his appellate counsel was ineffective for omitting the same issue on appeal; and (3) his 55-year sentence offends due process because he is subject to deportation. (Dkts. 1, 77).

7

I. **Ineffective Assistance of Trial Counsel (Claim One)**

The Illinois Appellate Court reasonably decided that Hamilton suffered no prejudice from the introduction of rape testimony. *See Hamilton*, 2014 WL 7274874, at *8. Since the absence of prejudice dooms Hamilton's ineffective-assistance claim, the Court "need not determine whether counsel's performance was deficient." *Strickland*, 466 U.S. at 697. Applying *Strickland*—the appropriate Supreme Court precedent for ineffective-assistance claims—the Illinois Appellate Court explained why the rape testimony had the potential to prejudice a factfinder. *Hamilton*, 2014 WL 7274874, at *8. Under a state rule of evidence, parallel to Federal Rule of Evidence 404(b), evidence that a defendant committed a criminal act separate from the conduct on trial is inadmissible to show the defendant's propensity to commit crimes. *Id.* (citations omitted); *see also* Fed. R. Evid. 404(b). Hamilton's concern is that Beck's mother's testimony that he had raped Beck prejudiced him by encouraging the trial judge to draw an impermissible propensity inference. (Dkt. 1 at 5; Dkt. 77 at 3).

Nonetheless, the appellate court found the "overwhelming" evidence of Hamilton's guilt "negated any possibility of prejudice." *Hamilton*, 2014 WL 7274874, at *8. This was a reasonable conclusion. *See Dunn v. Neal*, 44 F.4th 696, 706, 710 (7th Cir. 2022) ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." (quoting *Strickland*, 466 U.S. at 695–96)); *Myers v. Neal*, 975 F.3d 611, 622–24 (7th Cir. 2020) (holding evidence of petitioner's guilt in a jury trial "overwhelmed any prejudicial effect" of counsel's failure to object to testimony that petitioner raped the murder victim); *Lumpkin v. Hermans*, 33 F.4th 403, 410–11 (7th Cir. 2022) (ruling that the state court reasonably decided counsel's failure to impeach a key witness did not prejudice petitioner because of "overwhelming" other incriminating evidence); *Eckstein v. Kingston*, 460 F.3d 844, 849–50

8

(7th Cir. 2006) (holding state-court no-prejudice decision was reasonable despite counsel's failure to impeach a witness with evidence of her mental illness where "overwhelming evidence corroborated" her testimony).

"Overwhelming" is a fair characterization of the evidence against Hamilton. Blood on Hamilton's truck, boot, and sock and in his apartment—matching Beck's blood "to a high degree of certainty"—linked Hamilton to the scene of the murder. *Hamilton*, 2014 WL 7274874, at *6. Hamilton's work shirt disappeared on the day of the murder, suggesting he discarded additional blood-stained clothing. The footprint in Beck's apartment matching Hamilton's work boot also indicates his presence at the murder scene. Although the shirt button in the hallway could have come from a police uniform, it is consistent with Hamilton being at the scene—and perhaps, hastily changing out of his bloody work shirt. According to cell phone records, Hamilton was near Beck's apartment during her murder. Soon after, he moved "rapidly" toward his own apartment.

From Sweat's testimony, Hamilton displayed suspicious behavior around the time of the murder. He was unreachable during the murder and gave his fiancée ever-changing excuses as he dashed back and forth between work and home. The stories Hamilton told sweat also contradicted those he told police. At first, he claimed to have slept in and arrived late to work, without driving past Beck's apartment. But after police confronted Hamilton with phone records, he backtracked: he might have been searching for his truck bed cap at a coworker's home in Beck's neighborhood. Hamilton's inconsistent statements to police and refuted alibis are circumstantial evidence of his consciousness of guilt. *See United States v. Rajewski*, 526 F.2d 149, 158 (7th Cir. 1975) ("It is well settled that untrue exculpatory statements may be considered as circumstantial evidence of the defendant's consciousness of guilt."); *see also Myers*, 975 F.3d at 626. Evidence of Hamilton's gripes over child support and visitation established his motive to harm Beck. Hamilton became

9

visibly angry at child-support proceedings. And he told police that Beck approached child-support and visitation issues unreasonably.

Considered together, the evidence gave powerful support to the State's theory—that Hamilton murdered Beck in her apartment before 6:00 a.m., returned home to clean up and get rid of bloody clothing, and arrived at work around 8:00 a.m. Further, the case proceeded as a bench trial by a judge who routinely hears evidence that he must sort using the rules of evidence. Here, with the evidence presented, excluding the rape statement, a trial judge would have no difficulty finding Hamilton guilty beyond a reasonable doubt. Even without drawing any impermissible inferences from the rape testimony, the evidence was sufficient for this conclusion. *See Williams v. Illinois*, 567 U.S. 50, 69 (2012) (plurality opinion) ("[I]n bench trials, judges routinely hear inadmissible evidence that they are presumed to ignore when making decisions." (quoting *Harris v. Rivera*, 454 U.S. 339, 346 (1981) (per curiam))); *accord Ambrose v. Roeckeman*, 749 F.3d 615, 621 (7th Cir. 2014) ("[T]he potential for prejudice caused by the admission of . . . evidence [of prior bad acts] is minimized in the context of a bench trial." (citing *Williams*, 567 U.S. at 69)); *United States v. Shukri*, 207 F.3d 412, 419 (7th Cir. 2000) ("In a bench trial, we assume that the district court was not influenced by evidence improperly brought before it unless there is evidence to the contrary."). It is doubtful that the evidence of a past rape had any influence on the trial judge's finding. Before the trial judge was a mountain of other evidence proving Hamilton's presence at the murder scene, motive to harm the victim, and consciousness of guilt. The strength of the State's case against Hamilton drowned out any possibility of prejudice.

The Illinois Appellate Court was convinced also and went further: even if Hamilton had a jury trial, keeping out the rape evidence would not have changed the result. *See Hamilton*,

2014 WL 7274874, at *8.[7] That stronger conclusion was reasonable. *See Myers*, 975 F.3d at 624 (acknowledging rape testimony "undoubtedly had some impact on the [jury] trial," but other evidence of murder precluded a showing of prejudice); *see also Anderson v. Sternes*, 243 F.3d 1049, 1057–58 (7th Cir. 2001) (holding counsel's failure to seek a limiting instruction on evidence of seized weapons did not cause prejudice because it would have been unlikely to change the jury's view of other evidence which was the "crux" of the case). Necessarily, the weaker conclusion—that the rape testimony caused no prejudice during Hamilton's bench trial—was reasonable too. Since Hamilton cannot show prejudice, his claim fails.

## II. Ineffective Assistance of Appellate Counsel (Claim Two)

Since Hamilton's ineffective-assistance-of-trial-counsel claim is meritless, his appellate counsel did not prejudice him by failing to raise the same claim on appeal. *See Carrion v. Butler*, 835 F.3d 764, 778–79 (7th Cir. 2016) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel." (quoting *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996))).

## III. Due Process (Claim Three)

Finally, Hamilton's Fourteenth Amendment due process claim is procedurally defaulted. Before seeking federal habeas relief, the petitioner must exhaust available remedies in state court. 28 U.S.C. §§ 2254(b), (c). To exhaust a claim in state court, the petitioner "must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory." *Wilson v. Cromwell*, 58 F.4th 309, 319 (7th Cir. 2023) (quoting *Lewis v. Sternes*, 390 F.3d 1019, 1025–26 (7th Cir. 2004)). Ensuring that the state has an opportunity to

---

[7] The appellate court relied on Illinois Supreme Court precedent that "erroneous admission of evidence of other crimes carries a high risk of prejudice" in a jury trial, but it is "less likely to have a prejudicial impact" in a bench trial. *Hamilton*, 2014 WL 7274874, at *8 (quoting *People v. Lindgren*, 402 N.E.2d 238, 243–44 (Ill. 1980)).

11

address purported violations of federal rights, the petitioner "must fairly present his federal claim through one complete round of review in state court, 'thereby alerting that court to the federal nature of the claim.'" *Brown v. Eplett*, 48 F.4th 543, 552 (7th Cir. 2022) (quoting *Baldwin v. Reese*, 541 U.S. 27, 29 (2004)). Four factors guide the fair-presentation inquiry: "(1) whether the petitioner relied on federal cases that engage in a constitutional analysis; (2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; (3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and (4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation." *Id.* (citing *Whatley v. Zatecky*, 833 F.3d 762, 771 (7th Cir. 2016)). "All four factors need not be present," and "a single factor does not automatically avoid default." *Id.* (quoting *Whatley*, 833 F.3d at 771).

Hamilton did not fairly present his federal due process claim in his *pro se* direct PLA to the Illinois Supreme Court.[8] Because Hamilton faces inevitable deportation, his PLA argued, the trial court "abused its discretion" by imposing a 55-year sentence. (Dkt. 84-2). Rather than the United States Constitution, Hamilton invoked the Illinois Constitution's Proportionate Penalties Clause, which provides, in pertinent part: "All penalties shall be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Dkt. 84-2 at 5); Ill. Const. art. 1, § 11. Hamilton cited one federal case, which held that the Supreme Court's denial of certiorari cannot be construed as an opinion on the merits—making only passing references to due process, unrelated to Hamilton's claim. *See Daniels v. Allen*,

---

[8] As noted, Wills has not provided this Court with Hamilton's brief on direct appeal to the Illinois Appellate Court. But even if Hamilton had fairly presented a federal due process claim to the appellate court—which is doubtful because the appellate court's opinion made no mention of federal due process, *see Hamilton*, 962 N.E.2d at 1106–07—fair presentation must occur at every level, including in a PLA to the Illinois Supreme Court, which it wasn't. *See Baldwin*, 541 U.S. at 29; *Bolton v. Akpore*, 730 F.3d 685, 694–95 (7th Cir. 2013).

12

344 U.S. 443, 497, 500, 507 (1953). Neither of the two state-court decisions Hamilton cited mentions federal due process. *See People v. O'Neal*, 531 N.E.2d 366, 368 (Ill. 1988) (explaining that reviewing courts in Illinois can reduce excessive sentences resulting from a trial court's abuse of discretion); *People v. Stacey*, 737 N.E.2d 626, 630 (Ill. 2000) (holding a sentence excessive, relying on the Illinois Constitution's Proportionate Penalties clause and state statute).

Hamilton did not frame his excessive-sentence claim in a way that would call to mind a federal due process claim. Nor do the facts underlying his claim fall within the mainstream of due process litigation. Not one of the four factors suggests fair presentation. *See Brown*, 48 F.4th at 552. At bottom, Hamilton's PLA could not have alerted the state court to the federal nature of his claim. *See Baldwin*, 541 U.S. at 33; *see also McKinley v. Butler*, 809 F.3d 908, 910 (7th Cir. 2016) (petitioner's invocation of the Illinois Constitution's Proportionate Penalties Clause did not fairly present a federal claim under the Eighth Amendment). Since Hamilton did not fairly present his due process claim at every level, it is procedurally defaulted.

Procedural default precludes federal habeas review unless the petitioner can show: (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law"; or (2) that failure to consider the defaulted claim would "result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Wilson*, 58 F.4th at 319. Hamilton has not tried to make either showing. *See Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008) (ruling that a petitioner's failure to argue cause and prejudice or a miscarriage of justice precludes review); *Carter v. Douma*, 796 F.3d 726, 734 (7th Cir. 2015) (same); *see also Franklin v. Gilmore*, 188 F.3d 877, 884 (7th Cir. 1999). Nor could he.

"'Cause' is an objective factor external to the defense that impeded the presentation of the claim to the state courts." *Lee-Kendrick v. Eckstein*, 38 F.4th 581, 589 (7th Cir. 2022) (quotation

omitted); *Davila v. Davis*, 582 U.S. 521, 528 (2017). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis for the claim was not reasonably available; or (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007). Not one of these factors is present here. Indeed, there is no indication that any external factor influenced Hamilton's decision to present his excessive-sentence claim to the state court without reference to federal due process. Hamilton "cannot claim cause and prejudice based on his own failure" to fairly present a federal claim. *Lee-Kendrick*, 38 F.4th at 589; *accord Garcia v. Cromwell*, 28 F.4th 764, 775 (7th Cir. 2022).

Finally, the miscarriage-of-justice exception excuses procedural default "only in the rare case where the petitioner can prove that he is actually innocent of the crime of which he has been convicted." *Wilson*, 58 F.4th at 319 (quoting *Blackmon v. Williams*, 823 F.3d 1088, 1099 (7th Cir. 2016)); *see also McQuiggin v. Perkins*, 569 U.S. 383, 387 (2013) (explaining that the petitioner must present new evidence which would have prevented any reasonable juror from finding him guilty). Hamilton has not offered new evidence of actual innocence. Having made certain that no exception applies, the Court cannot review Hamilton's defaulted claim.

### IV. Leave to Amend

Turning to Hamilton's motion for leave to amend, Federal Rule of Civil Procedure 15, applicable to habeas proceedings through 28 U.S.C. § 2242, allows a petitioner to amend his habeas petition "once as a matter of course within . . . 21 days after service of a responsive pleading." Fed. R. Civ. P. 15(a)(1)(B); *see Mayle v. Felix*, 545 U.S. 644, 663 (2005); Fed. R. Civ. P. 81(a)(4). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave," which is freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). Two days after Wills responded to Hamilton's habeas petition, Hamilton filed a motion

to amend the petition "as a matter of course." (Dkt. 85 at 2).[9] That motion was unnecessary because Hamilton could have amended his petition without leave. *See* Fed. R. Civ. P. 15(a)(1); *cf. Swanigan v. City of Chicago*, 775 F.3d 953, 963 (7th Cir. 2015). But the window for amendment as a matter of course has now closed: Wills served his responsive pleading more than 21 days ago. *See* Fed. R. Civ. P. 15(a)(1); *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015).

An older version of Rule 15(a)(1),[10] the Seventh Circuit held, obliged district courts to grant an unnecessary motion for leave to amend—at least, while the window to amend as a matter of course remained open. *Stewart v. RCA Corp.*, 790 F.2d 624, 631 (7th Cir. 1986); *Peckman v. Scanlon*, 241 F.2d 761, 764 (7th Cir. 1957). The old Rule gave plaintiffs an "absolute right to file an amended complaint" until service of a responsive pleading. *Id.* Since no responsive pleading had been filed in *Stewart* and *Peckman*, the window for amendment as a matter of course had not closed. *Stewart*, 790 F.2d at 631 ("RCA has yet to answer the complaint, so Stewart is entitled to amend 'as a matter of course.'"); *Peckman*, 241 F.2d at 764 ("[N]o responsive pleading had been filed at the time of the court's order," and "the positive language of the rule appears to leave no room for interpretation or construction other than that it confers an absolute right, of which the pleader cannot be deprived."); *accord Porm v. Peters*, 996 F.2d 1219 (7th Cir. 1993).

---

[9] As noted, Hamilton dated his motion October 8, 2022. But the Court need not decide whether the "mailbox rule"—which considers certain motions by *pro se* prisoners to be filed upon receipt by prison authorities—applies to Hamilton's motion to amend. *See Houston v. Lack*, 487 U.S. 266, 276 (1988) (applying the mailbox rule to a *pro se* prisoner's notice of appeal); *Jones v. Bertrand*, 171 F.3d 499, 501 (7th Cir. 1999) (extending the mailbox rule to a *pro se* habeas petition); *Rutledge v. United States*, 230 F.3d 1041, 1051 (7th Cir. 2000) ("We have not extended the [mailbox] rule to motions to amend, and we need not reach that issue . . . ."); *see also, e.g.*, *Bradd v. United States*, 2005 WL 1459200, at *2 (N.D. Ill. June 16, 2005) (refusing to apply the mailbox rule to a motion to amend a habeas petition). Whether Hamilton's motion to amend was filed on October 8 or November 9 has no bearing on the Court's analysis of the motion. Either way, Hamilton filed the motion before or within 21 days after service of Wills's November 7 response. *See* Fed. R. Civ. P. 15(a)(1). This was years after seeking continuances and stays which never panned out.

[10] Before 2009, the Rule stated: "A party may amend its pleading once as a matter of course . . . before being served with a responsive pleading." *Runnion*, 786 F.3d at 522 (quoting Fed. R. Civ. P. 15(a)(1) (2009)).

15

In 2009, Rule 15(a)(1) "was amended to limit [the] right to amend as a matter of course." *Runnion*, 786 F.3d at 522. The 2009 amendment altered "the time allowed to make one amendment as a matter of course." Fed. R. Civ. P. 15 advisory committee's note to 2009 amendment. Relevant here, the "the right to amend once as a matter of course is no longer terminated by service of a responsive pleading" but instead, terminates 21 days later. *Id.* Thus, the "coercive effect evident in the text is that 21 days after service of a [responsive pleading], a plaintiff's right to amend changes from one guaranteed under Rule 15(a)(1) to one governed by the liberal standard under Rule 15(a)(2)." *Runnion*, 786 F.3d at 522–23.

The Seventh Circuit has not decided whether an unnecessary motion for leave preserves the right to amend as a matter of course under Rule 15(a)(1) beyond the 21-day deadline after service of a responsive pleading. *Cf. Swanigan*, 775 F.3d at 963 ("Because no responsive pleading or motion to dismiss had been filed, the 21-day clock under Rule 15(a)(1)(B) never started and [plaintiff] retained the right to amend his complaint."). Several courts have held that it does not. *See Coventry First, LLC v. McCarty*, 605 F.3d 865, 869–70 (11th Cir. 2010) (per curiam) (concluding that an unnecessary motion to amend "invited the District Court to review its proposed amendments"); *accord Glazer v. Chase Home Fin. LLC*, 704 F.3d 453, 458–59 (6th Cir. 2013) (holding needless motion for leave to amend waived the right to amend as a matter of course), *abrogated on other grounds by Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029 (2019); *see also, e.g.*, *Duclos v. La*, 2022 WL 17477916, at *2–4 (S.D. Cal. Dec. 6, 2022) (finding a *pro se* plaintiff's unnecessary motion to amend "inconsistent with his amending as a matter of course" and denying leave for failure to attach a proposed amended complaint); *Salcido v. Att'y Gen. of Ariz.*, 2022 WL 1013803, at *3 (D. Ariz. Apr. 5, 2022) (finding a habeas petitioner's unnecessary motion to amend did not guarantee amendment as a matter of course). Of course, "in most cases,

16

a party who makes a motion to amend before the period for amendment as of course has expired does so inadvertently," so "treating the amendment as if it had been made under Rule 15(a)(1) avoids penalizing the pleader for not understanding the rule." 6 Charles Alan Wright et al., Federal Practice and Procedure § 1482 (3d ed. 2023). That policy concern is present here, especially since Hamilton is proceeding *pro se*.

But the text of Rule 15(a)(1) does not curb this Court's discretion to consider Hamilton's motion for leave to amend according to the liberal justice-so-requires standard under Rule 15(a)(2). *See id.* ("Since the 2009 amendment of Rule 15(a)(1) limiting the right to amend as a matter of course to 21 days after serving a pleading or 21 days after a responsive pleading or Rule 12 motion is served, the possibility that a later amendment as of course might be allowed has effectively been eliminated." (footnote omitted)). Under Rule 15(a)(2), the Court "may deny leave to amend . . . where there is good reason to do so," including "futility, undue delay, prejudice, or bad faith." *L. Offs. of David Freydin, P.C. v. Chamara*, 24 F.4th 1122, 1133 (7th Cir. 2022) (quoting *R3 Composites Corp. v. G&S Sales Corp.*, 960 F.3d 935, 946 (7th Cir. 2020); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).

Justice does not require Hamilton's amendment. Over seven years after the Court encouraged Hamilton to amend his petition as soon as possible, he has failed to submit a proposed amended petition or otherwise adequately explain how he intends to cure his petition's shortcomings. *See L. Offs. of David Freydin*, 24 F.4th at 1133–34 (explaining that failure to submit an amended pleading "may indicate a lack of diligence and good faith," and delay prevents meaningful assessment of whether the amendment would cure deficiencies (quotation omitted)). Since "judges are not mind readers," leave to amend is inappropriate where, as here, there is "no way of knowing" what the proposed amendment would entail. *See Webb v. Frawley*, 906 F.3d 569,

582 (7th Cir. 2018) (quoting *James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 401 (7th Cir. 2006)); *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015) ("A motion to amend should state with particularity the grounds for the motion and should be accompanied by the proposed amendment." (quoting *Otto v. Variable Annuity Life Ins., Co.*, 814 F.2d 1127, 1139 (7th Cir. 1986))); *see also, e.g.*, *Rosas v. Roman Cath. Archdiocese of Chi.*, 748 F. App'x 64, 66 (7th Cir. 2019) (affirming denial of leave to amend where the plaintiff "did not even attempt to submit a proposed pleading"). Under these circumstances, allowing amendment as a matter of course would encourage habeas petitioners to invoke the right reflexively—not to correct pleading deficiencies and promote efficient resolution of their claims on the merits, but to delay the proceedings—forcing respondents and courts to engage with futile amendments. *See Reyes v. United States*, 998 F.3d 753, 761 (7th Cir. 2021) ("To the extent that § 2244's exacting standards might not prevent prisoners from inundating district courts with meritless motions to amend, courts can and should use their discretion under Rule 15 to prevent abusive or needlessly time-consuming tactics.").

Even if Hamilton's unnecessary motion for leave preserved his right to amend as matter of course, that right "is not absolute": the Court may deny leave to amend "if the proposed amendment fails to cure the deficiencies in the original pleading." *Arlin-Golf, LLC v. Village of Arlington Heights*, 631 F.3d 818, 823 (7th Cir. 2011) (quoting *Foster v. DeLuca*, 545 F.3d 582, 584 (7th Cir. 2008)); *Johnson v. Dossey*, 515 F.3d 778, 780 (7th Cir. 2008); *Crestview Vill. Apartments v. U.S. Dep't of Hous. & Urb. Dev.*, 383 F.3d 552, 558 (7th Cir. 2004); *Green v. Litscher*, 103 F. App'x 24, 25–26 (7th Cir. 2004); *Timas v. Klaser*, 23 F. App'x 574, 578 (7th Cir. 2001); *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1057 n.4 (7th Cir. 1998); *Mitchell v. Collagen Corp.*, 67 F.3d 1268, 1273–74 (7th Cir. 1995), *vacated on other*

*grounds*, 518 U.S. 1030 (1996), *Perkins v. Silverstein*, 939 F.2d 463, 471–72 (7th Cir. 1991). This exception avoids "impos[ing] upon [respondents] and the courts the arduous task of responding to an obviously futile gesture on the part of [petitioners]." *See Crestview*, 383 F.3d at 558 (quoting *Perkins*, 939 F.2d at 472).

Hamilton's motion to amend explains only that he intends "to correct omissions in his petition and other oversites [sic] and mistakes." (Dkt. 85 at 2). Hamilton had an opportunity to refine his arguments and correct mistakes in his later-filed reply brief. (*See* Dkt. 86). If Hamilton hopes to add new claims—as the Court cautioned in 2015—those claims must relate back to the claims in the original petition or independently meet the AEDPA's statute of limitations. 28 U.S.C. § 2244(d)(1); *Mayle*, 545 U.S. at 655; Fed. R. Civ. P. 15(c)(2). An amended petition does not relate back "when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle*, 545 U.S. at 650. Instead, a new claim will ordinarily relate back when it depends "on the same facts as the original pleading and only changes the legal theory." *Id.* at 664 n.7 (quotation omitted). Without a proposed amendment, the Court can only presume that an amended petition would be futile. Accordingly, the Court denies Hamilton's motion for leave to amend without prejudice.

V. **Certificate of Appealability**

Hamilton's ineffective-assistance claims fail because he has not shown prejudice. And his federal due process claim is procedurally defaulted. The Court therefore denies Hamilton's petition for a writ of habeas corpus. Further, the Court declines to issue a certificate of appealability because Hamilton failed to make a substantial showing of the denial of a constitutional right, or that reasonable jurists would disagree with the Court's decision on his habeas petition. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**CONCLUSION**

For the reasons above, Hamilton's motion to vacate his conviction and sentence under 28 U.S.C. § 2254 [1] is denied. Hamilton's motion for leave to amend the petition for a writ of habeas corpus [85] is denied without prejudice.

_____
Virginia M. Kendall
United States District Judge

Date: June 20, 2023